**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| AARGON AGENCY, INC., Nevada corporation; ALLIED COLLECTION SERVICES, INC., a Nevada corporation; ASSETCARE, LLC, a Texas limited liability company; CAPIO PARTNERS, LLC, a Texas limited liability company; CF MEDICAL, LLC, a Nevada limited liability company; CLARK COUNTY COLLECTION SERVICE, LLC, a Nevada limited-liability company; COLLECTION SERVICE OF NEVADA, a Nevada corporation; NEVADA COLLECTORS ASSOCIATION, a Nevada non-profit corporation; PLUSFOUR, INC., a Nevada corporation; RM GALICIA, INC., doing business as Progressive Management, LLC; THE LAW OFFICES OF MITCHELL D. BLUHM & ASSOCIATES, LLC, a Georgia limited liability company, | No. 22-15352<br><br>D.C. No.<br>2:21-cv-01202-RFB-BNW<br><br><br>OPINION |

*Plaintiffs-Appellants,*

v.

SANDY O'LAUGHLIN, in her
capacity as Commissioner of State Of
Nevada Department Of Business And
Industry Financial Institutions
Division,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of Nevada
Richard F. Boulware II, District Judge, Presiding

Argued and Submitted September 2, 2022
San Francisco, California

Filed June 15, 2023

Before:  William A. Fletcher, Jay S. Bybee, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge VanDyke

# SUMMARY[**]

## Consumer Rights

The panel affirmed the district court's order denying preliminary injunctive relief to entities engaged in consumer debt collection in their action asserting a facial challenge to Nevada Senate Bill 248 ("S.B. 248"), which requires debt collectors to provide written notification to debtors 60 days before taking any action to collect a medical debt.

Plaintiffs alleged that S.B. 248 is unconstitutionally vague, constitutes a prior restraint in violation of the First Amendment, and is preempted by the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA").

The panel affirmed the district court on the grounds that plaintiffs failed to show a likelihood of success on the merits of their claims. The panel first rejected plaintiffs' claim that the term "action to collect a medical debt" in S.B. 248 was unconstitutionally vague, noting that the implementing regulations set forth examples of actions that do, and do not, constitute actions to collect a medical debt.

Addressing the First Amendment claim that S.B. 248 impermissibly burdens plaintiffs' speech, the panel held that: S.B. 248 regulates commercial speech and therefore is not subject to strict scrutiny; communications to collect a medical debt "concerned lawful activity" and were not "inherently misleading;" Nevada's asserted interest in

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

protecting medical debtors in Nevada from financial ruin in the wake of the Covid-19 pandemic was substantial; S.B. 248 directly advanced the government interest asserted; and S.B. 248 was not a more extensive regulation than necessary to serve the State's interest.

The panel next rejected plaintiffs' argument that the FCRA, which regulates the creation and the use of consumer reports by consumer reporting agencies for certain specific purposes, expressly preempts S.B. 248 under 15 U.S.C. § 1681t(b)(1)(F) because that provision broadly preempts any state law "relating" to the duties of persons or debt collection agencies who furnish information to credit reporting agencies. The panel declined to read § 1681t(b)(1)(F) this broadly, determining rather that its presumptive effect was limited by the specific reporting requirements imposed by 15 U.S.C. § 1681s-2. The panel concluded that S.B. 248's 60-day notification period in no way interferes with the reporting obligations as spelled out in § 1681s-2. The panel further held that S.B. 248 was not impliedly preempted by the FCRA because it does not interfere with debt collectors' responsibilities to furnish fair and accurate information to credit reporting agencies.

The panel also rejected plaintiffs' contention that the FDCPA, whose purpose is to "protect vulnerable and unsophisticated debtors from abuse, harassment, and deceptive collection practices" impliedly preempts S.B. 248 because S.B. 248 prohibits debt collectors from sending debtors required notifications pertaining to debt collection, as set forth in 15 U.S.C. §§ 1692e and 1692g. The panel stated that the notification contemplated in § 7 of S.B. 248 is not an attempt to collect a debt. Instead, S.B. 248 provides consumers with the protection of a 60-day notification period before any action is taken to collect a medical debt,

while the requirements of FDCPA's § 1692e and § 1692g apply once debt collectors attempt to collect a debt. The panel determined that S.B. 248 removes no protection under the FDCPA, but rather, protects consumers for an additional period of 60 days. The state law provides more protection than the FDCPA provides standing alone. For that reason, it is not inconsistent with the FDCPA.

Dissenting, Judge VanDyke disagreed with the majority's conclusion that plaintiffs were unlikely to succeed on the merits of their preemption claims. Addressing the FDCPA, Judge VanDyke stated that two provisions in S.B. 248 were inconsistent with the FDCPA and as such were preempted. First, a debt collector cannot both comply with timely providing the FDCPA's required notices in its initial communication with a debtor while also complying with S.B. 248's 60-day prohibition against debt collectors taking any action to collect a debt. Second, because S.B. 248 obligates debt collectors to include confusing information in communications to a debtor, it requires debt collectors to violate the FDCPA's prohibition against using confusing or misleading representations in their communications with debtors.

Addressing the FCRA preemption claim, Judge VanDyke stated that the FCRA expressly preempts the entirety of S.B. 248 because the text of the FCRA explicitly manifests Congress's intent to displace state laws regulating how debt collectors report credit information to reporting agencies. S.B. 248 further undermines Congress's purposes in enacting the FCRA by decreasing the accuracy of credit reporting and thus is impliedly preempted.

Finally, with respect to the remaining factors for a preliminary injunction, Judge VanDyke would have

concluded that Aargon Agency will suffer irreparable harm absent a preliminary injunction, and that the balance of equities and the public interest weigh in favor of enjoining S.B. 248.

**COUNSEL**

Patrick J. Reilly (argued), Brownstein Hyatt Farber Schreck LLP, Las Vegas, Nevada; James K. Schultz, Sessions Israel & Shartle LLC, San Diego, California; David Israel, Sessions Fishman Nathan & Israel LLC, Metairie, Louisiana; for Plaintiffs-Appellants.

Kiel Ireland (argued), Deputy Attorney General; Office of the Nevada Attorney General; Carson City, Nevada; Akke Levin, Deputy Attorney General; Steven Shevorski, Chief Litigation Counsel; Aaron D. Ford, Attorney General of Nevada; Office of the Nevada Attorney General; Las Vegas, Nevada; for Defendant-Appellee.

Rusty Graf, Black & LoBello, Las Vegas, Nevada; James Wadhams, Black & Wadhams PLLC, Las Vegas, Nevada, for Amicus Curiae Nevada Hospital Association.

# OPINION

W. FLETCHER, Circuit Judge:

In June 2021, Nevada enacted Senate Bill 248 ("S.B. 248"), Act of June 2, 2021, ch. 291, 2021 Nev. Stat. 1668, in response to the COVID-19 pandemic.  S.B. 248 requires debt collectors to provide written notification to debtors 60 days before taking any action to collect a medical debt.  Plaintiffs are entities engaged in consumer debt collection.  They filed suit in district court against defendant, Commissioner of the Financial Institutions Division of Nevada's Department of Business and Industry, bringing a facial challenge to the law.  They moved for a temporary restraining order and a preliminary injunction, contending that S.B. 248 is unconstitutionally vague, violates the First Amendment, and is preempted by both the federal Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA").

The district court denied plaintiffs' motion for a temporary restraining order and a preliminary injunction.  Plaintiffs timely appealed the denial of the preliminary injunction.  We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I. Background

Plaintiffs-appellants Aargon Agency, Inc. and others ("plaintiffs") are corporations and limited-liability companies that engage in the collection of consumer debt (including medical debt) and in credit reporting.  Plaintiffs generally work on a contingency basis, getting paid only if they succeed in collecting debt.  Defendant-appellee Sandy O'Laughlin ("defendant" or "Commissioner") is

Commissioner of the Financial Institutions Division of Nevada's Department of Business and Industry.

Nevada enacted S.B. 248 in response to the COVID-19 pandemic. *See Minutes of the Sen. Comm. on Com. and Lab.: Hearing on S.B. 247 and 248*, 2021 Leg., 81st Sess. 11 (Nev. Mar. 2021) [hereinafter *Minutes*]. The governor signed the bill into law on June 2, 2021, and it went into effect on July 1, 2021.

S.B. 248 amends Chapter 649 of the Nevada Revised Statutes, which governs debt collection agencies. S.B. 248 § 1 (Nev. 2021). Section 7 of S.B. 248 requires debt collection agencies to send a written notification to medical debtors 60 days before taking any action to collect a medical debt. It provides:

> Not less than 60 days before taking any action to collect a medical debt, a collection agency shall send by registered or certified mail to the medical debtor written notification that sets forth:
>
> > (a) The name of the medical facility, provider of health care or provider of emergency medical services that provided the goods or services for which the medical debt is owed;
> >
> > (b) The date on which those goods or services were provided; and
> >
> > (c) The principal amount of the medical debt.

*Id.* § 7(1). The notification must provide the name of the collection agency and must inform the debtor that, as

applicable, either the "medical debt has been assigned to the collection agency for collection" or that the "collection agency has otherwise obtained the medical debt for collection." *Id.* § 7(2).

Section 7.5 permits a collection agency to accept a voluntary payment from the debtor, so long as certain conditions are met. An agency may accept voluntary payment only if the medical debtor initiates contact with the agency. *Id.* § 7.5(1)(a). To accept voluntary payment, the agency must disclose to the debtor that "payment is not demanded or due," and that the "medical debt will not be reported to any credit reporting agency during the 60-day notification period specified in [§ 7(1)]." *Id.* § 7.5(1)(b). "No action by a medical debtor to initiate contact with a collection agency may be construed to allow the collection agency to take action to collect the medical debt before the expiration of the 60-day notification period . . . ." *Id.* § 7.5(2).

After briefing to this court but before oral argument, defendant promulgated regulations implementing S.B. 248. *See* Nev. Admin. Code R055-21 (adopted March 23, 2022; filed June 13, 2022). The regulations define "action to collect a medical debt" for purposes of § 7 and § 7.5 of S.B. 248 as "any attempt by a collection agency or its manager, agents or employees to collect a medical debt from a medical debtor." *Id.* § 3(1). The regulations provide six examples of actions that are, and four examples that are not, "action[s] to collect a medical debt." Examples of actions to collect a medical debt are "[p]lacing telephone calls to the medical debtor"; "[s]ending letters and notices, other than a 60-day notification, to the medical debtor"; "[c]ontacting the medical debtor by any electronic means"; "[r]eporting the medical debt to any credit reporting agency"; [d]emanding

payment of the medical debt"; and "[c]ommencing any civil action against the medical debtor." *Id.* Examples of actions that are not actions to collect a medical debt are "[a]ny action initiated by a medical debtor"; [t]he provision to a medical debtor of clarification relating to the content of a 60-day notification by a collection agency or its manager, agents or employees if the contact is initiated by the medical debtor"; "[s]ending verification of a medical debt to the medical debtor if requested by the medical debtor"; and "[s]ending a receipt to a medical debtor for a voluntary payment." *Id.*

After S.B. 248 became law but before it went into effect, plaintiffs filed suit in the district court. Plaintiffs argued, inter alia, that S.B. 248 is unconstitutionally vague, constitutes a prior restraint in violation of the First Amendment, and is preempted by the FCRA and the FDCPA. Plaintiffs requested prospective injunctive relief, including a temporary restraining order and a preliminary injunction.

The district court denied plaintiffs' motion for a temporary restraining order and a preliminary injunction, holding that plaintiffs are unlikely to succeed on the merits of their claims.

Plaintiffs timely appealed the denial of their motion for a preliminary injunction.

## II. Standard of Review

We review a denial of a preliminary injunction for abuse of discretion. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 838 (9th Cir. 2019). "An abuse of discretion occurs when the district court based its ruling on an erroneous view of the law or on a clearly erroneous

assessment of the evidence." *Id.* (quoting *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014)).

## III. Discussion

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (brackets added). We use a "sliding scale" approach according to which "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* (alteration in original) (internal quotation marks omitted).

### A. Likelihood of Success

On appeal, plaintiffs make three arguments directed to the merits. They argue that S.B. 248 is unconstitutionally vague; that S.B. 248 violates the First Amendment; and that the FCRA and the FDCPA preempt S.B. 248. We agree with the district court that none of these arguments is likely to succeed. We address each in turn.

#### 1. Vagueness

Plaintiffs argue that S.B. 248 is unconstitutionally vague because it fails to define the term "any action to collect a medical debt" contained in § 7(1), and thereby allows for arbitrary enforcement by the State. Plaintiffs argue that debt collectors are "left to guess" whether they are allowed, for

example, to verify an incoming caller's identity, to answer a debtor's questions about their debt, or to assist with processing insurance claims.

"A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (quoting *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004)). "Nevertheless, perfect clarity is not required even when a law regulates protected speech" because "we can never expect mathematical certainty from our language." *Id.* (first quoting *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001); then quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). "When a statute clearly implicates free speech rights, it will survive a facial challenge so long as it is clear what the statute proscribes in the vast majority of its intended applications." *Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (internal quotation marks omitted). An economic regulation "is subject to a less strict vagueness test," both because "its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (footnotes omitted).

The district court concluded, even without the assistance of the regulations quoted above, that the term "action to collect a medical debt" is not unconstitutionally vague. If there were any doubt about the correctness of the district court's holding, that doubt was removed when the defendant adopted the regulations, quoted above, giving examples of

actions that do, and do not, constitute actions to collect a medical debt.

## 2. First Amendment

Plaintiffs argue that S.B. 248 impermissibly burdens their speech in violation of the First Amendment. They first argue that debt-collection communications are not commercial speech and that S.B. 248 is therefore subject to strict scrutiny. They then argue that even if debt-collection communications are commercial speech, the district court erred in its commercial speech analysis. We disagree with both arguments.

We may dispose of plaintiffs' first argument quickly. Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). This definition is just a "starting point," and courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (internal quotation marks omitted). We agree with the district court that S.B. 248 regulates commercial speech. When debt collection agencies communicate with a debtor in an attempt to collect medical debt, the communication proposes a commercial transaction in which the debtor would pay, in whole or in part, a past-due medical debt.

Plaintiffs' second argument requires a little more analysis. Because S.B. 248 regulates commercial speech, we analyze it under the four-part test of *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). *See Retail Digit. Network, LLC v. Prieto*, 861 F.3d 839, 841 (9th Cir. 2017) (reaffirming that

we apply the *Central Hudson* test to restrictions on commercial speech).  *Central Hudson* provides:

> At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566.  We take the four parts in turn.

First, plaintiffs' speech comes within the protection of the First Amendment because communications to collect a medical debt "concern lawful activity" and are not "inherently misleading."  *See Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106–07 (9th Cir. 2004) (explaining that while "inherently misleading" speech receives no First Amendment protection, regulations that target "potentially misleading" speech must satisfy the remaining *Central Hudson* factors).

Second, Nevada's asserted interest is "substantial."  S.B. 248 seeks to protect medical debtors in Nevada from financial ruin in the wake of the COVID-19 pandemic. *Minutes* at 12, 15.  During the pandemic, an unusually high number of Nevadans needed medical care, and many Nevadans lost employer-sponsored health insurance.  *Id.* at 11.  Roughly twenty percent of Nevadans had medical debt

that had gone to collection agencies, *id.*, and an increased number of Nevadans had filed for bankruptcy, *id.* at 15.

Third, S.B. 248 "directly advances the governmental interest asserted." The 60-day notification period required by § 7 provides time for debtors to communicate with medical providers and insurance companies, allowing debtors to verify whether the debt actually exists and to seek available financial assistance before collection attempts begin. *Minutes* at 16.

For the first time on appeal, Plaintiffs argue that S.B. 248 fails to directly advance the state's interest because it is constitutionally underinclusive. *See Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 904–05 (9th Cir. 2009). Relying on *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173 (1999), plaintiffs argue that S.B. 248 is unconstitutional because it restricts debt-collection speech by debt collection agencies but not by medical providers.

Assuming that plaintiffs have not forfeited that argument, *see One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009), it is in any event unpersuasive. We explained in *Metro Lights*:

> [R]egulations are unconstitutionally underinclusive when they contain exceptions that bar one source of a given harm while specifically exempting another in at least two situations. First, if the exception ensures that the [regulation] will fail to achieve [its] end, it does not materially advance its aim. This is the lesson of *Greater New Orleans*: self-defeating speech restrictions will violate the

> First Amendment. Second, exceptions that make distinctions among different kinds of speech must relate to the interest the government seeks to advance.

551 F.3d at 906 (alteration in original) (citations and internal quotation marks omitted).

Neither of the situations we described in *Metro Lights* is present here. S.B. 248 is not "self-defeating." *Id.* Rather, as evident from the face of S.B. 248, the law provides useful breathing room to a class of debtors who sorely need it. Nor is the distinction between medical debt collection agencies and medical providers unrelated to the governmental interest. Collection agencies seek payment of debts for which medical providers have already unsuccessfully sought payment. Once a medical provider passes debt on to a collector, collection costs and fees can drastically multiply the amount owed, forcing some debtors into bankruptcy. *Minutes* at 11, 13. Additionally, compared to medical providers, collection agencies have different incentives and employ different collection techniques. Collection agencies are often paid on a contingency basis, compete with one another based on how effective they are at obtaining recovery, and possess resources and expertise that medical providers lack. 85 Fed. Reg. 76735 (Nov. 30, 2020). In light of these differences, the State is justified in providing greater protection from the actions of collection agencies than from those of medical providers.

Fourth, S.B. 248 is not a more extensive regulation than necessary to serve the State's interest. "The fourth part of the [*Central Hudson*] test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the

interests that support it." *Greater New Orleans*, 527 U.S. at 188. This part of the test requires "a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal citations and quotation marks omitted). The restriction need not be the "least restrictive means" of achieving the desired objective. *Id.*

The fit between Nevada's goal and the means to accomplish that goal is reasonable and proportionate. S.B. 248 does not completely ban commercial speech by debt collection agencies. Instead, it prohibits speech constituting an "action to collect a medical debt," and only within a 60-day notification period. This allows medical debtors time to do such things as ascertain whether the debt is actually owed or is owed in the amount claimed, contact relevant insurance carriers, or take other actions.

### 3. Preemption

Plaintiffs argue that S.B. 248 is preempted by two federal laws—the Fair Credit Reporting Act, and the Fair Debt Collection Practices Act.

"The Supremacy Clause provides the constitutional foundation for federal authority to preempt state law." *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016) (citing U.S. Const. art. VI, cl. 2; *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012)). "Preemption of state law, by operation of the Supremacy Clause, can occur in one of several ways: express, field, or conflict preemption." *Id.* at 1178 (citing *Kurns*, 565 U.S. at 630–31). Express preemption occurs "when the text of a federal

statute explicitly manifests Congress's intent to displace state law." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013)). Federal law may also impliedly preempt state law through either field or conflict preemption. *Ass'n des Éleveurs*, 33 F.4th at 1114. Conflict preemption, potentially relevant here, occurs when "compliance with both federal and state regulations is a physical impossibility" or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (first quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

"When addressing questions of express or implied preemption, we begin our analysis with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (alteration in original) (internal quotation marks omitted). "[T]he purpose of Congress is the ultimate touchstone" of any preemption analysis. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

### a. Fair Credit Reporting Act

The Fair Credit Reporting Act ("FCRA") "regulates the creation and the use of consumer report[s] by consumer reporting agenc[ies] for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334–35 (2016) (alterations in original) (internal quotation marks omitted). Plaintiffs argue that the

FCRA expressly preempts S.B. 248 under 15 U.S.C. § 1681t(b)(1)(F) to the extent that S.B. 248 prohibits a debt collector from reporting medical debt until 60 days after providing a notification pursuant to § 7. S.B. 248 § 7.5(1)(b)(2). Plaintiffs argue further that the FCRA impliedly preempts S.B. 248, because the state law presents an obstacle to the accomplishment of the FCRA's purpose.

### (1) Express Preemption

Plaintiffs contend that S.B. 248 is expressly preempted because it is inconsistent with 15 U.S.C. § 1681t(b)(1)(F). We disagree.

Section 1681t addresses the FCRA's "[r]elation to State laws." 15 U.S.C. § 1681t; *see Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1166 (9th Cir. 2009). The statute provides that, in general:

> Except as provided in subsections (b) and (c), this subchapter does not annul, alter, affect or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers . . . except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1681t(a).

Congress added § 1681t(b) to the FCRA so as to "avoid a patchwork system of conflicting regulations." *Ross v. F.D.I.C.*, 625 F.3d 808, 813 (4th Cir. 2010) (internal quotation marks and citation omitted). Section

1681t(b)(1)(F), upon which plaintiffs rely, provides in relevant part: "No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ."  In turn, § 1681s-2 imposes specific duties and responsibility on "furnishers," including on debt collection agencies, which furnish information to credit reporting agencies ("CRAs"). *Id.* § 1681s-2.  Section 1681s-2(a) requires that furnishers provide accurate information to CRAs by, for example: (1) refraining from reporting inaccurate information when furnishers have knowledge of errors or have received notice and confirmation of errors; (2) correcting and updating the CRAs if previously provided information is incomplete or inaccurate; (3) if the information furnished is disputed by the consumer, informing CRAs that such information is disputed; (4) providing notice to CRAs of voluntarily closed accounts; and (5) within 90 days after furnishing information to CRAs about delinquent accounts, notifying CRAs of the date of delinquency.  *Id.* §§ 1681s-2(a)(1)-(5).  Section 1681s-2(b) requires furnishers, upon notice of consumer dispute of furnished information, to conduct an investigation and report results of the investigation to the CRA.

Plaintiffs contend that § 1681t(b)(1)(F) broadly preempts any state law "relating to" a furnisher's duties.  We decline to read § 1681t(b)(1)(F) this broadly.  The Supreme Court has told us that the use of the phrase "with respect to" "massively limits the scope of preemption" to only those state laws that "concern" the phrase's referents.  *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013) (interpreting the Federal Aviation Administration Authorization Act's preemption provision).  Section

1681t(b)(1)(F) limits its preemptive effect to state laws "with respect to any subject matter regulated under . . . section 1681s-2," making clear that its preemptive effect is limited by the requirements imposed by § 1681s-2.

We therefore agree with the Second Circuit that "§ 1681t(b)(1)(F) does not preempt state law claims against a defendant who happens to be a furnisher of information to a consumer reporting agency within the meaning of the FCRA if the claims against the defendant do not also concern that defendant's legal responsibilities as a furnisher of information under the FCRA." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 446 (2d Cir. 2015); *see also Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 6–8 (1st Cir. 2022) (interpreting an analogous FCRA preemption provision, 15 U.S.C. § 1681t(b)(1)(E), narrowly).  S.B. 248 does not fall within the exception to § 1681t(a) set out in § 1681t(b)(1)(F), because it does not affect furnishers' obligations to provide accurate information to CRAs as regulated by § 1681s-2(a), nor does it affect their obligations upon notice of consumer disputes as regulated by § 1681s-2(b).

It is true that § 1681s-2 includes some requirements relating to the timing of furnishers' reporting obligations. For example, furnishers must "promptly notify" a CRA if they regularly furnish information to CRAs about a consumer and have furnished information to the CRA that they then determine is "not complete or accurate," *id.* § 1681s-2(a)(2)(B), and furnishers must report a date of delinquency to a CRA within 90 days after furnishers have provided information to the CRA about delinquent accounts, *id.* § 1681s-2(a)(5)(A).  *See also id.* §§ 1681s-2(a)(8)(E)(iv), (b)(1)(E), (b)(2).  However, § 1681s-2 nowhere sets out a

deadline for when furnishers must report a debt to a CRA. S.B. 248's 60-day notification period in no way interferes with furnishers' reporting obligations as spelled out in § 1681s-2.

### (2) Implied Preemption

Plaintiffs argue that S.B. 248 is impliedly preempted by the FCRA because it stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. We disagree here, too.

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (noting that legislative history reveals the FCRA's "consumer oriented objectives"). Plaintiffs argue that S.B. 248 interferes with the accuracy of credit reporting by building in an artificial reporting delay. However, S.B. 248 does not interfere with debt collectors' responsibility to furnish fair and accurate information to CRAs. If anything, allowing medical debtors a brief window of time—60 days—after receiving a collection agency's notification under S.B. 248 to verify their debt may improve the accuracy of the information that debt collectors furnish to CRAs.

Our dissenting colleague objects that we do not cite any evidence in the record showing that, by providing additional time to debtors to verify their medical debt, S.B. 248 increases accuracy of the information possessed by debt collectors. Dissent at 50–51. We recognize that ultimately, how S.B. 248 affects the accuracy of credit reporting is an

empirical question that is not really answered in the record before us.  But plaintiffs, not the Commissioner, have the burden to demonstrate a likelihood of success on the merits. *See Preminger v. Principi*, 422 F.3d 815, 823 n.5 (9th Cir. 2005).  Plaintiffs fail to provide any factual or legal support for their bald assertion that S.B. 248 "impermissibly blurs the clear credit picture."

### b. Fair Debt Collection Practices Act

Plaintiffs also contend that the Fair Debt Collection Practices Act ("FDCPA") impliedly preempts S.B. 248 because, in plaintiffs' view, it is impossible to comply with both the FDCPA and S.B. 248.  We disagree.

The purpose of the FDCPA is to "protect vulnerable and unsophisticated debtors from abuse, harassment, and deceptive collection practices."  *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 938 (9th Cir. 2007). Section 1692e prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  A debt collector violates § 1692e by, inter alia, failing to provide the consumer with a so-called mini-Miranda warning—a "disclos[ure] in the initial . . . communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose."  *Id.* § 1692e(11).

The Act additionally requires that debt collectors send written validation notices to debtors.  Section 1692g(a) provides:  "Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice

containing," inter alia, the amount of the debt, the name of the creditor, and statements about the validity and verification of the debt.

The FDCPA's preemption provision is similar in some respects to that of the FCRA. It provides:

> This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

15 U.S.C. § 1692n. An important difference between the FDCPA's preemption provision and that of the FCRA is that § 1692n states that federal law provides a floor rather than a ceiling. State laws that afford consumers with stronger protection than the FDCPA are not preempted.

Plaintiffs contend that S.B. 248 prohibits debt collectors from sending the so-called mini-Miranda warning required under § 1692e(11). As noted above, S.B. 248 requires collection agencies to notify debtors "60 days before taking any action to collect a medical debt." S.B. 248 § 7(1). Plaintiffs argue that S.B. 248 prevents collection agencies from providing consumers with the mini-Miranda warning required by the FDCPA, in which debt collectors must disclose in their "initial communication" "that the debt

collector is attempting to collect a debt." 15 U.S.C. § 1692e(11).

Plaintiffs' argument assumes that a § 7 notification is a communication "in connection with the collection of any debt" within the meaning of 15 U.S.C. § 1692e that would trigger the mini-Miranda warning requirement. The language of § 1692e, together with the language of § 1692e(11), forecloses that argument. The FDCPA generally prohibits "false, deceptive, or misleading representation or means *in connection with the collection of any debt*." *Id.* § 1692e (emphasis added). Failing to provide a mini-Miranda warning is one way a debt collector can violate the prohibition. A debt collector must disclose "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." *Id.* § 1692e(11). The two paragraphs, taken together, show that communications "in connection with the collection of any debt" are communications in which a debt collector is attempting to collect a debt. *See Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) ("[F]or a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor."); *Gburek v. Litton Loan Servicing*, 614 F.3d 380, 384 (7th Cir. 2010) (observing that a letter to a delinquent debtor listing payments due was not a "communication in connection with the collection of any debt" because "it did not demand payment and did not otherwise attempt to collect the debt"); *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216–17 (11th Cir. 2012).

The notification contemplated in § 7 of S.B. 248 is not an attempt to collect a debt. In sending a § 7 notification, debt collectors make no demand for payment or otherwise

engage in "a strategy to make payment more likely." *Grden*, 643 F.3d at 173. In fact, when sending a § 7 notification, a debt collector must inform the debtor that the notification "is not a demand for payment." Nev. Admin. Code R055-21 § 4(2)(b). Moreover, S.B. 248 requires that debt collectors provide a notification at least 60 days *"before* taking any action to collect a medical debt." S.B. 248 § 7(1) (emphasis added); *see also* Nev. Admin. Code R055-21 § 3(1) (defining "action to collect a medical debt" "to mean any attempt by a collection agency or its manager, agents or employees to collect a medical debt from a medical debtor"). Debt collectors can easily comply with both S.B. 248 and with the mini-Miranda warning requirement by first sending out a § 7 notification and later providing the mini-Miranda warning.

For the same reason, debt collectors can comply with both S.B. 248 and the validation notice required by § 1692g. Under § 1692g(a), a validation notice must be sent "[w]ithin five days after the initial communication with a consumer *in connection with the collection of any debt*." (emphasis added). Again, because the written notification required by S.B. 248 must be sent 60 days before any action to collect a debt, such communication is not a communication "in connection with the collection of any debt." S.B. 248 thus does not prevent debt collectors from sending a validation notice five days after an initial communication in connection with the collection of any debt.

Our dissenting colleague contends that a § 7 notification is a communication "in connection with the collection of a[] debt," because "there is only one reason debt collectors reach out to debtors—to collect debts." Dissent at 37–38. That reasoning conflates the question of what motivates a debt collector with the distinct question, relevant here, of what the

debt collector attempts to accomplish by providing the § 7 notification required by S.B. 248. Even though debt collectors are ultimately motivated by the goal of successful collection, "the [FDCPA] does not apply to *every* communication between a debt collector and a debtor." *Gburek*, 614 F.3d at 385. Our sister circuits have noted a number of instances in which a communication between a debt collector and a debtor was not "in connection with the collection of a[] debt" for purposes of the FDCPA, because the particular communication did not constitute an attempt to collect debt. *See Heinz v. Carrington Mortg. Servs., LLC*, 3 F.4th 1107, 1113–15 (8th Cir. 2021); *Bailey v. Sec. Nat. Servicing Corp.*, 154 F.3d 384, 388–89 (7th Cir. 1998); *Grden*, 643 F.3d at 173. For the reasons discussed above, here, we have one more such instance.

The FDCPA's preemption provision confirms that S.B. 248 is not in conflict with the FDCPA. That provision provides that "a State law is not inconsistent with [the FDCPA] if the protection such law affords any consumer is greater than the protection provided by [the FDCPA]." 15 U.S.C. § 1692n. As we have explained, S.B. 248 provides consumers with the protection of a 60-day notification period before any action is taken to collect a medical debt, while the requirements of § 1692e and § 1692g apply once debt collectors attempt to collect a debt. S.B. 248 thus extends the period of time during which consumers receive protection that enables them to verify or challenge the debt and prevents debt collectors from reporting the debt, sending repeated communications to debtors, or taking any other adverse action. The state law provides more protection than the FDCPA provides standing alone. For that reason, it is not inconsistent with the FDCPA. 15 U.S.C. § 1692n. Our dissenting colleague disagrees. He contends that by

delaying FDCPA warnings, S.B. 248 provides less, rather than, greater protection.  Dissent at 40.  Our colleague ignores the fact that S.B. 248 removes no protection under the FDCPA, but rather, protects consumers for an additional period of 60 days.

Plaintiffs also argue that Regulation F of the Consumer Financial Protection Bureau ("CFPB"), which implements the FDCPA, preempts S.B. 248.  Plaintiffs argue that S.B. 248 prevents debt collectors from using the CFPB's model validation notice and thereby "interferes with the methods by which the federal statute was designed to reach [its] goal." *Arellano v. Clark Cnty. Collection Serv., LCC*, 875 F.3d 1213, 1216 (9th Cir. 2017) (alteration in original) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).

Regulation F requires debt collectors to provide "validation information" to consumers by sending a validation notice "in the initial communication" or "[w]ithin five days of th[e] initial communication."  12 C.F.R. § 1006.34(a) (2021).  Regulation F defines "initial communication" as "the first time that, in connection with the collection of a debt, a debt collector conveys information, directly or indirectly, regarding the debt to the consumer." *Id.* § 1006.34(b)(2).  Regulation F's preemption standard mirrors that of the FDCPA, providing: "a State law is not inconsistent with the Act or the corresponding provisions of [Regulation F] if the protection such law affords any consumer is greater than the protection provided by the Act or the corresponding provisions of [Regulation F]." *Id.* § 1006.104.

As with the FDCPA itself, Regulation F governs debt collectors' conduct after they convey information "in

connection with the collection of a debt." By contrast, S.B. 248's § 7 notification must be sent before debt collectors undertake any action to collect a debt. Plaintiffs can comply with § 7 of S.B. 248 and, upon expiration of S.B. 248's 60-day notification period, send the CFPB's model validation notice. *See id.* § 1006.34(d)(2).

Finally, plaintiffs argue that in practice the Commissioner regards the notification required by § 7 of S.B. 248 as a communication "in connection with the collection of a debt." In making this argument, plaintiffs point to form letters that they submitted for approval and that the Commissioner approved. There is some variation among the approved form letters, but the letter reproduced in plaintiffs' brief is representative. The letter states that "payment is not demanded or due within sixty (60) days from the date of this letter," and that "we will take no *other* action to collect this debt until 60 days from the date of this letter." (Emphasis added.) The letter then goes on to state, "This is an attempt to collect a debt."

The Commissioner candidly admits in her brief to us that "[t]he Debt Collectors are correct that, as written, the quoted form letter is confusing and does not comply with SB 248." However, the Commissioner's mistaken approval of the form letters does not mean that S.B. 248 is inconsistent with the FDCPA. The Commissioner apparently understood the risk that her approval of the proposed letters might be mistaken. Her approval was conditioned on a written disclaimer stating, in relevant part, that "the machine letter approval shall not constitute a legal opinion upon which [a collection agency] may rely as a written guaranty or legal opinion that [their] collection letters comply with all state and federal laws, applicable regulations and ordinances."

More important, the form letters were approved by the Commissioner before August 24, 2021.  On August 24, the Commission issued a draft regulation specifying that a notification sent pursuant to § 7 of S.B. 248 must explicitly state that the notification "is not intended to be a communication under the Fair Debt Collection Practices Act."  *See* Exhibit to Plaintiffs' Supplemental Response to the Division's Notice of Intent to Promulgate Regulations at 4, *Aargon Agency, Inc. v. O'Laughlin*, No. 2:21-cv-01202-RFB-BNW (D. Nev. Aug. 29, 2021), ECF No. 40.  The final regulations later adopted by the Commission require that any communication sent to a debtor pursuant to S.B. 248 include that same statement.  *See* Nev. Admin. Code R055-21 § 4(2)(b).

Plaintiffs speculate in their brief to us that the form letters were likely to "confuse or mislead" the "least sophisticated debtor," and so, violate the FDCPA.  *See Terran v. Kaplan*, 109 F.3d 1428, 1432–33 (9th Cir. 1997).  However, as the district court noted, there is no evidence that any of the mistakenly approved letters were actually sent to debtors.  Indeed, as soon as the draft regulations were circulated on August 24, 2021, it became obvious that the letters were in error.  A "speculative, hypothetical possibility" that debtors would have been confused by the form letters cannot sustain plaintiffs' facial challenge.  *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 866 (9th Cir. 2009).  We see no basis for enjoining the enforcement of a state law when the law itself is valid and enforceable, even if at some early point the Commissioner mistakenly approved a letter that did not comply with S.B. 248.

## B. Remaining *Winter* Factors

Because plaintiffs fail to show any likelihood of success on any of their claims, we have no need to address any of the remaining *Winter* factors.

## Conclusion

We hold that the district court did not abuse its discretion in denying Plaintiffs' motion for a preliminary injunction.

**AFFIRMED.**

---

VANDYKE, Circuit Judge, dissenting:

In the face of a state law that prohibits a debt collector from complying with the Fair Debt Collection Practices Act (FDCPA) and that undermines a central purpose of the Fair Credit Reporting Act (FCRA), the majority concludes that Aargon Agency is unlikely to succeed on its preemption claims.[1] I disagree and, because other equitable factors favor a preliminary injunction, I would reverse the district court's denial of a preliminary injunction. The majority's position on these two claims rests on two unwarranted beliefs and a conflation of express preemption with conflict preemption.[2]

The majority's first belief is that the FDCPA does not preempt S.B. 248 because the notice that S.B. 248 requires debt collectors to send (a "Section 7 Notice") is not an action

---

[1] For convenience, I refer to the joint plaintiff-appellants collectively as "Aargon Agency."

[2] Because I would grant a preliminary injunction based the preemption claims, I would not reach Aargon Agency's constitutional claims.

in connection with collection of a debt.  But that position requires setting aside common sense.  S.B. 248 requires that, before debt collectors take certain actions to collect a medical debt, collectors must send debtors a "Section 7 Notice" that includes certain information about the debt, and then wait sixty days before taking any further action.  The only reason that a debt collector sends a Section 7 Notice is so that he can later start collecting a debt.  It is impossible to imagine a situation where a *debt collector* would send such a notice except in pursuit of his goal of ultimately obtaining payment for (i.e., *collecting*) the debt.

The majority's second belief is that delayed reporting of a debtor's failure to pay a debt does not affect the accuracy of credit reporting.  That leads the majority to conclude that the FCRA does not impliedly preempt S.B. 248.  That belief too is unrealistic.  Because S.B. 248 delays the reporting of unpaid debts, it conflicts with the FCRA's goal of ensuring accurate credit information.  The FCRA thus impliedly preempts S.B. 248.

Finally, the majority conflates express preemption with conflict preemption.  In purporting to analyze Aargon Agency's express preemption claim under the FCRA, the majority addresses whether S.B. 248 makes it impossible for a debt collector to comply with both S.B. 248 and the FCRA.  But that is a conflict preemption inquiry, and the express preemption claim is instead governed by the language of the statute's preemption clause.

## DISCUSSION

## I.      The FDCPA and the FCRA Preempt S.B. 248.

"A fundamental principle of the Constitution is that Congress has the power to preempt state law" when

exercising its enumerated powers.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Congress can preempt state law expressly or impliedly.  *See id.*; *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).  Congress impliedly preempts state laws that either render compliance with both federal and state law impossible or present an obstacle to the accomplishment of Congress's purposes in passing a statute. *See Ryan v. Editions Ltd. W., Inc*., 786 F.3d 754, 761 (9th Cir. 2015) (quotation omitted).

The FDCPA requires debt collectors to take actions that S.B. 248 prohibits and prohibits them from taking actions that S.B. 248 requires.  The FDCPA, accordingly, preempts those conflicting prohibitions and requirements in S.B. 248. The FCRA, on the other hand, preempts the entirety of S.B. 248 because the FCRA expressly preempts S.B. 248 and because the state law frustrates the FCRA's purposes.

### A. S.B. 248 Renders Compliance with the FDCPA Impossible.

The FDCPA expressly preempts state law that is inconsistent with it, "to the extent of the inconsistency."  15 U.S.C. § 1692n.  Two of the provisions in S.B. 248 are inconsistent with the FDCPA and, as such, are preempted.

First, S.B. 248 requires that a debt collector initiate communication with a debtor before taking further action to collect a medical debt and provide certain information about the debt, and then take no further action for sixty days— including sending any further notices—to collect the debt. Yet the FDCPA requires that a debt collector include in its "initial communication" with the debtor a so-called "mini-*Miranda* warning" and to notify the debtor, within five days of that "initial communication," of his validation rights (in what can be termed a "Validation Rights Notice").  *See* 15

U.S.C. § 1692g(a); *id.* § 1692e(11).  Because a debt collector cannot both comply with S.B. 248's mandatory pause on communications and simultaneously send the FDCPA's required communications, the FDCPA preempts S.B. 248's prohibition against a debt collector timely giving the mini-*Miranda* warning and the Validation Rights Notice.

Second, because S.B. 248 obligates debt collectors to include confusing information in communications to a debtor, it requires collectors to violate the FDCPA's prohibition against using confusing or misleading representations in their communications with debtors.  The FDCPA thus preempts S.B. 248's requirement that debt collectors provide such communications to debtors.

### i.  The FDCPA Preempts S.B. 248's Prohibition Against Giving Notices Required by the FDCPA.

The FDCPA requires that debt collectors provide two notices to debtors in, or within five days following, any "initial communication with a [debtor] in connection with the collection of any debt": a mini-*Miranda* warning and a Validation Rights Notice.  15 U.S.C. § 1692g(a); *see also id.* § 1692e(11).[3]   The mini-*Miranda* provision obligates a

---

[3] The mini-*Miranda* provision, 15 U.S.C. § 1692e(11), contains the same language triggering a debt collector's notification duties as the Validation Rights Notice provision, *id.* § 1692g(a), only placing the language in different parts of the section.  *See id.* § 1692e(11) (prohibiting any misleading representation "in connection with the collection of any debt" and, giving as one example, the failure to provide the mini-*Miranda* warning in "the initial communication with the [debtor]").  For convenience, when referring to the triggering language for either the mini-*Miranda* or the Validation Rights Notice, I will

collector, in the "initial communication with a [debtor] in connection with the collection of a[] debt," to inform the debtor that "the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." *Id.* § 1692e(11). The Validation Rights Notice requires that a debt collector inform a debtor within five days of its "initial communication" that the debtor may request verification of the debt within thirty days of the notice and that, if he does not request verification, "the debt will be assumed to be valid by the debt collector." *Id.* § 1692g(a)(3), (5).

The State admits that a Section 7 Notice cannot include a mini-*Miranda* warning, implicitly conceding that a mini-*Miranda* warning is an "action to collect a … debt."[4] And because S.B. 248 offers no reason to conclude that a mini-*Miranda* warning is an "action to collect a … debt" while a Validation Rights Notice is not, the State must also agree that a Validation Rights Notice is an "action to collect a … debt." S.B. 248 prohibits a debt collector from taking "any action," such as these, "to collect a … debt" until the collector gives a Section 7 Notice and waits sixty days. But the FDCPA requires that the mini-*Miranda* and Validation Rights Notices be given in, or within five days following, any initial communication in connection with the collection of a debt. 15 U.S.C. § 1692g(a); *id.* § 1692e(11). Unless the

---

simply quote from the Validation Rights Notice requirement section. *See id.* § 1692g(a).

[4] The State has not been completely consistent on this question. After passage of S.B. 248, Nevada approved several form letters that debt collectors could use to send a Section 7 Notice. Included in some of these form letters was the mini-*Miranda* warning. But the State in its more recent actions has distanced itself from these earlier approvals.

Section 7 Notice is somehow not an "initial communication … in connection with the collection of a debt," the plain text of S.B. 248 and the FDCPA clash.  *Id.* § 1692g(a).  A debt collector cannot both initiate contact with a debtor by providing the Section 7 Notice and then not further contact that debtor for sixty days while also giving the FDCPA's required warnings within five days of that "initial communication."

The majority does not dispute that, if a Section 7 Notice is an "initial communication" under the FDCPA, S.B. 248 and the FDCPA conflict.  Instead, the majority concludes that the Section 7 Notice is not an "initial communication … in connection with the collection of a[] debt."   15 U.S.C. § 1692g(a).  This attempt to carve an escape hatch out from the clear conflict between the two statutes does not hold up.

A Section 7 Notice is an "initial communication … in connection with the collection of a[] debt."  *Id.* § 1692g(a).  The breadth of the FDCPA's text makes clear that Congress's purpose was to require the FDCPA's notices at the very outset of any collection effort.  The FDCPA requires that debt collectors give the warnings within five days of an "initial communication … *in connection with* the collection of any debt."  *Id.* § 1692g(a) (emphasis added).  As courts have observed on many occasions, "in connection with" indicates that Congress gave the statute a broad reach.  *See, e.g.*, *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019); *People of State of Cal. v. FCC*, 905 F.2d 1217, 1240 (9th Cir. 1990).  Congress used such broad language to ensure that the debtor receives certain information up front whenever a debt collector first contacts the debtor.  That is why one of these warnings is colloquially referred to as a "mini-*Miranda*" warning.  *See, e.g.*, *Garfield v. Ocwen Loan Servicing, LLC*,

811 F.3d 86, 92 (2d Cir. 2016) (referring to the information required by 15 U.S.C. § 1692e(11) as a "mini-*Miranda*" warning). Thus, even if the collector is early in the process when he provides a Section 7 Notice, the conclusion that he is not communicating with the debtor "in connection with the collection of a[] debt" ignores the clear breadth of the FDCPA's language. *Id.* § 1692g(a).

Indeed, the majority asks the reader to indulge the obvious fiction that a debt collector sending a Section 7 Notice is doing so for some reason *other than* to eventually "collect[] … a[] debt." *Id.* But there is only one reason debt collectors reach out to debtors—to collect debts. Everyone knows that.

The silliness of pretending debt collectors would send Section 7 Notices for any reason other than to collect a debt is easily illustrated. Assume a debt collector in another state—who must comply with the FDCPA but faces no legal obligations comparable to S.B. 248—emails a debtor and tells her that she owes a debt of a certain amount, incurred by receiving medical services on a certain date, and that he is a debt collector. Acting altruistically, this collector always gives the debtor such information and then avoids taking any further action for sixty days. In short, this hypothetical debt collector voluntarily provides precisely what S.B. 248 requires—but just because he's a nice guy. During the debt collector's voluntary sixty-day waiting period, the debtor sues him, claiming that he never gave her the initial notices she was entitled to receive under the FDCPA. *See* 15 U.S.C. § 1692k (permitting private actions to enforce the FDCPA). The collector tells the judge that the FDCPA did not require him to give those notices yet, as the email he sent the debtor was not an "initial communication … in connection with the collection of a[] debt"; it was just an email giving the debtor

some information before he later began to collect.  *Id.*
§ 1692g(a).

This would be an easy case.  Whatever altruistic
purposes may have motivated the collector to provide an
early notice and waiting period, his email was nonetheless
his "initial communication" with the debtor "in connection
with the collection of any debt."  *Id.* § 1692g(a).  The
majority's position that a Section 7 Notice does not
somehow fall within the clear text of the FDCPA's "initial
communication" requirement is a position divorced from
reality.

The majority advances two arguments in favor of reading
a Section 7 Notice as something other than an "initial
communication … in connection with the collection of a[]
debt."  *Id.*  First, the majority argues that, for purposes of the
mini-*Miranda* warning, "initial communications" are only
those communications "in which a debt collector is
attempting to collect a debt."[5]  I agree.  But as discussed
above, a debt collector governed by S.B. 248 who provides
a Section 7 Notice does so only because he is attempting to
collect a debt.  The fact that S.B. 248 prevents him from
taking further action for sixty days following the Section 7
Notice changes nothing about why the debt collector is
contacting the debtor.  A person is still *attempting* to obtain
something even when the satisfaction of that goal remains
far off or requires additional intermediate steps.  Aspiring
law students take the LSAT because they want to become a
lawyer.  The fact that they will not become a licensed
attorney immediately after they take the exam doesn't

---

[5] The majority does not advance this argument to rescue S.B. 248 from
conflicting with the Validation Rights Notice.

change what they are trying to accomplish in taking the test. Likewise, if asked, any debt collector answering honestly would explain that the only reason he would send a Section 7 Notice is so that he can collect the debt after the sixty days expire.

The majority responds with the unilluminating point that it is possible for a debt collector to communicate with a debtor without the communication being "in connection with the collection of a[] debt." *Id.* § 1692g(a). Sure. Consider, for example, a letter from a debt collector telling a debtor that the debt is forgiven. While that would presumably trigger celebration by the debtor, it would not trigger the mini-*Miranda* warning or the Validation Rights Notice. But the mere fact that it is possible for a communication between a debtor and a debt collector to be not "in connection with the collection of any debt" hardly evinces that a notice given as a necessary prerequisite to the collector demanding payment is anything other than such a communication. When a debt collector issues a notice because the notice is a legal prerequisite to the collector taking more affirmative action to collect the debt, that notice is clearly "in connection with the collection of a[] debt." *See Scott v. Trott L., P.C.*, 760 F. App'x 387, 391 (6th Cir. 2019) (unpublished) (explaining that a published notice required by Michigan law before the execution of a foreclosure "qualifies under the FDCPA as an 'initial communication'"); *cf. Romea v. Heiberger & Assocs.*, 163 F.3d 111, 116 (2d Cir. 1998) (concluding that a letter sent to a debtor was a communication in connection with the collection of a debt, even if the notice was also a "statutory condition precedent to commencing a summary eviction proceeding"). Although the majority pulls cases from several circuits in an attempt to support its conclusion that a Section 7 Notice is not a

triggering communication under the FDCPA, none of those cases involve a notice that is a necessary prerequisite to the collector demanding payment. *See Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 171 (6th Cir. 2011) (involving a *response* from the collector to the debtor's request for his account balance); *Bailey v. Sec. Nat. Servicing Corp.*, 154 F.3d 384, 389 (7th Cir. 1998) (involving a letter "warning that something bad might happen if payment is not kept current"); *Heinz v. Carrington Mortg. Servs., LLC*, 3 F.4th 1107, 1112 (8th Cir. 2021) (involving communications related to the debtor's "loan modification application" and "loss mitigation assistance application").

Second, the majority argues that a Section 7 Notice is not an "initial communication" because S.B. 248—state law—purports to place the Section 7 Notice sixty days prior to a debt collector "taking any action to collect a medical debt." But of course, we must look to federal law to define the scope of federal law. Or, to put it otherwise, a state law cannot escape its conflict with federal law by mere ipse dixit.

In short, a debt collector cannot timely provide the FDCPA's mandatory mini-*Miranda* warning or Validation Rights Notice while complying with S.B. 248's prohibition against debt collectors taking "any action" to collect a debt. Under the FDCPA, S.B. 248's prohibition survives if it offers "greater … protection" to consumers than the FDCPA. *See* 15 U.S.C. § 1692n. It does not. Delaying the warnings that the FDCPA mandates at the beginning of the collection effort provides debtors less protection when they interact with debt collectors.

Although the two laws are inconsistent, the FDCPA preempts S.B. 248 "only to the extent" it is inconsistent with the FDCPA. *Id.* The FDCPA thus preempts S.B. 248 insofar

as it prohibits the mini-*Miranda* warning or the Validation Rights Notice.  *See Codar, Inc. v. Arizona*, 95 F.3d 1156 (9th Cir. 1996) (memorandum) (preempting Arizona law insofar as its licensing scheme would prevent an unlicensed debt collector from sending a Validation Rights Notice).

### ii.    S.B. 248 Requires Misleading Representations in Violation of the FDCPA.

If a debtor attempts to make a voluntary payment on a medical debt during S.B. 248's sixty-day window following the delivery of a Section 7 Notice, the debt collector must inform the debtor that payment on the debt is neither "due" nor "demanded."  S.B. 248 § 7.5(1)(b)(1).  This requirement conflicts with the FDCPA's prohibition against debt collectors sending misleading communications.

The FDCPA prohibits debt collectors from "us[ing] any … deceptive[] or misleading representation … in connection with the collection of a[] debt."  15 U.S.C. § 1692e.  A communication is misleading if the "least sophisticated debtor would likely be misled by a communication," a standard designed to take into account "consumers of below average sophistication or intelligence" who are "uninformed or naive."  *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1061–62 (9th Cir. 2011) (quotations omitted).

A debt collector who tells a consumer—a person who has incurred a debt, likely already received several notices from the creditor that payment is due or past-due, and now received a notice from a collection agency—that no payment is demanded or due "is likely to mislead the least-sophisticated debtor."  *Id.* at 1061 n.3.  That is because it is likely that a debtor—particularly an unsophisticated one—might think that the creditor forgave the debt or, at the very

least, wonder who she is supposed to pay: the original medical provider or this new agency.  At a minimum, the debtor will be confused, wondering "do I have an obligation to pay this, or not?"  Maybe a more sophisticated debtor would figure it out, but that is not the standard.

Literally ignoring that Aargon Agency argues that S.B. 248 requires "debt collectors to lie to debtors" by telling them no payment is due, (emphasis omitted), the majority omits any analysis of whether S.B. 248 requires a debt collector use misleading communications in violation of the FDCPA.  Perhaps the majority assumes that the argument is implicitly addressed in its (incorrect) conclusion that the initial notice required by S.B. 248, the Section 7 Notice, is not a "communication 'in connection with the collection of a[] debt.'"  15 U.S.C. § 1692e.  But that assumption would still be wrong.  Even if the majority were right that the Section 7 Notice itself is not an "initial communication in connection with collection of a debt," that would not address whether a collector who responds to an attempt to voluntarily pay a medical debt (an attempt itself in response to a Section 7 Notice) is a "representation … in connection with the collection of a[] debt."  15 U.S.C. § 1692e.  If anything, it is even clearer that a debt collector who has been contacted by a debtor attempting to voluntarily pay a medical debt and sends the notice required by S.B. 248 § 7.5 is doing everything necessary to *collect* the debt.  S.B. 248 requires debt collectors to make misleading representations.

Again, state law and the FDCPA are not inconsistent if state law offers "greater protection" to the consumers.  15 U.S.C. § 1692n.  But a communication that confuses the least sophisticated consumer does not offer more protection than the FDCPA's prohibition on misleading communications.  Thus, S.B. 248's requirement that

collectors inform debtors attempting to pay their debts that such debts are neither demanded nor due is inconsistent with (and preempted by) the FDCPA.

## B.  The FCRA Preempts S.B. 248 in Full.

Although the FDCPA only partially preempts S.B. 248, the FCRA both expressly and impliedly preempts S.B. 248 in full.  Accordingly, the majority errs in concluding Aargon Agency is unlikely to succeed on the merits of its preemption claims.

### i.    The FCRA Expressly Preempts S.B. 248.

"Express preemption arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022) (internal quotations omitted).  The text of the FCRA "explicitly manifests Congress's intent to displace state law[s]" regulating how debt collectors report credit information to reporting agencies.  *Id.*  The majority disagrees, imposing a narrow construction on the provision that the text does not support.  Worse, the majority's analysis reveals that it has failed to ask the right question—analyzing not whether the preemption clause covers S.B. 248 but whether a debt collector can technically comply with both the FCRA and S.B. 248.  That is not an express preemption analysis, however—it is a conflict preemption analysis, itself a form of implied preemption.

The FCRA states that "[n]o requirement or prohibition may be imposed under the laws of any State … with respect to any subject matter regulated under … section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies."  15

U.S.C. § 1681t(b)(1)(F).  Because section 1681s-2 regulates the "subject matter" of the legal responsibilities of those who furnish credit information to Consumer Reporting Agencies ("CRAs") when reporting information on payment or nonpayment of debts to CRAs, and because S.B. 248 is a "requirement or prohibition" with respect to that subject matter, the FCRA preempts S.B. 248.

First, section 1681s-2 regulates the "subject matter" of the legal responsibilities of those who furnish credit information to CRAs when reporting information to CRAs on payment or nonpayment of debts.  Section 1681s-2 requires, inter alia, that information-furnishers not knowingly furnish inaccurate information to CRAs; that they correct any inaccurate information that they reported to CRAs; and, if a consumer disputes information, that the furnisher inform the CRA that the information is disputed. *See id.* § 1681s-2(a)(1)–(3).  These are all rules on how and when information-furnishers must report information and what information they must not report (e.g., inaccurate information).  The "subject matter" regulated under this section is thus information-furnishers' legal duties when reporting payment or nonpayment of debts.

Second, the "subject matter" S.B. 248 regulates is "with respect to" how furnishers of information report information on delinquent accounts.  When a debt collector wants to report a debt to a CRA—thus operating as an information-furnisher—S.B. 248 requires that he first issue a Section 7 Notice and then wait sixty days before he can finally report the debt.  S.B. 248 § 7(1).  Because "with respect to," when used "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," S.B. 248 is clearly a law "with respect to" the "subject matter" regulated

under section 1681s-2. *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018) (examining the scope of "respecting").

The majority nevertheless concludes that the FCRA's preemption provision is narrow and does not cover S.B. 248. The majority's argument boils down to two points: (1) reliance on an inapposite Supreme Court decision and (2) the fact that, under something like a conflict preemption analysis, a debt collector could comply with both S.B. 248 and the FCRA. The Supreme Court decision the majority relies on, however, does not support its conclusion. And the majority's quasi-conflict preemption analysis tells little about whether the FCRA *expressly* preempts S.B. 248.

In its first argument, the majority relies on the Supreme Court's decision in *Dan's City Used Cars, Inc. v. Pelkey* for the proposition that the phrase "with respect to" "massively limits the scope of preemption" to just those state laws that "concern" the referents of the phrase. 569 U.S. 251, 261 (2013). If this were an accurate reading of *Dan's City Used Cars*, it would put that case in direct tension with other cases that have read the same, or materially identical, phrase "with respect to" as having a *broadening*, not narrowing, effect. *See, e.g.*, *Lamar, Archer & Cofrin, LLP*, 138 S. Ct. at 1760; *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 312 (2011) (reasoning that "[t]he phrase 'in respect to,'" within a jurisdictional bar against certain claims, "suggests a broad prohibition"); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (emphasizing that the phrase "'relating to' … express[es] a broad pre-emptive purpose"); *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 799 (9th Cir. 1987) ("Congress intended that the words 'relate to' be interpreted broadly." (citations omitted)). But *Dan's City Used Cars* is not actually at odds with those cases.

Instead, the majority misreads a quote from *Dan's City Used Cars* and thus misapplies the case.

In *Dan's City Used Cars*, the Court contrasted two preemption provisions. *See id.* at 260–61. One provision, the Airline Deregulation Act's (ADA) preemption clause, preempted all state laws so long as a single requirement was met: the law had to relate to a "price, route, or service of an air carrier." *Id.* at 256. In contrast, the other provision, the Federal Aviation Administration Authorization Act's (FAAAA) preemption clause, required that two requirements be met before a state law was preempted: the law had to (1) "relate[] to a price, route, or service of any motor carrier," *and* (2) the "price, route, or service of any motor carrier" had to be "with respect to the transportation of property." *Id.* at 260–61.

In contrasting the two preemption provisions, the Court offered the straightforward observation that the addition of the second requirement in the FAAAA preemption provision "massively limits the scope of preemption" of that provision *in comparison to the ADA's preemption provision*—not because "with respect to" carries some inherent limiting meaning but because the FAAAA reduced the scope of preemption vis-à-vis the ADA by *doubling* the boxes a law must check before it is preempted. *Id.* at 261 (quotation omitted).

The majority states the Court declared that the phrase "with respect to" itself "massively limits the scope of preemption," but the phrase "with respect to" had nothing to do with the Court's analysis. The Court was focused on the addition of a second requirement for preemption, and particularly the substance of that requirement. As the Court put it, "it is not sufficient that a state law relates to the 'price,

route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's '*transportation of property*.'" *Id.* (emphasis added) (citing *Pelkey v. Dan's City Used Cars*, 163 N.H. 483, 490 (2012)). The fact that the Court's restatement of the FAAAA's second preemption requirement substituted the word "concern" for "with respect to" underscores that the Court's analysis had nothing to do with the precise contours of the phrase "with respect to." *Id.* Instead, the Court was emphasizing that the FAAAA's additional requirement that the law concern—or, to use any other fungible synonym, "relate to," "regard," "respect," "be about," etc.—the "*transportation of property*" is what greatly decreased the provision's preemptive scope, not the mere phrase "with respect to."

Rather than support an artificially narrow reading of the FCRA's preemption provision, *Dan's City Used Cars* supports giving that provision its ordinary textual meaning here. In contrast to the FAAAA's preemption provision, the FCRA's preemption clause does not contain multiple substantive limitations that work together to "massively limit[]" its scope. *Dan's City Used Cars*, 569 U.S. at 261. The FCRA's preemption provision instead contains only one relevant limitation on what state laws are preempted: the law must be "with respect to any subject matter regulated under section 1681s-2." 15 U.S.C. § 1681t(b)(1)(F). Indeed, with its single prerequisite to preemption, the FCRA's preemption clause is more like the ADA's preemption clause than the FAAAA's, a clause which the Supreme Court described as "express[ing] a broad pre-emptive purpose." *Morales*, 504 U.S. at 384.**[6]** In short, nothing in *Dan's City*

_____

[6] Although *Morales* considered a provision preempting laws "*relating to*" certain matters and the FCRA preempts laws "with respect to" certain

*Used Cars* requires that the mere phrase "with respect to" be given an unnaturally crabbed reading in a context like this case.

Just as bad as its flawed reliance on *Dan's City Used Cars*, the majority's second argument reveals that the majority has set itself to the wrong task. The majority contends that S.B. 248 is not preempted because "§ 1681s-2 nowhere sets out a deadline for when furnishers must report a debt to a CRA." The majority's point is that, because the FCRA does not impose a specific timeline for *when* a debt collector must report a debt to a CRA, a collector can comply both with the FCRA's demands and the demands of S.B. 248. But even assuming the majority is right, that analysis would belong to a *conflict* preemption claim, where a plaintiff can show that a state law is impliedly preempted because it "is impossible for a private party to comply with both state and federal requirements," *Editions Ltd. W., Inc.*, 786 F.3d at 761. The claim, however, that the majority is purporting to analyze is an *express* preemption claim. For an express preemption claim, we look at the text of the preemption provision to determine if Congress intended to preempt the challenged state law. That text makes clear that S.B. 248, as a law "with respect to" the same subject matter regulated by section 1681s-2, is expressly preempted by the FCRA. *See* 15 U.S.C. § 1681t(b)(1)(F).

---

matters, 504 U.S. at 384 (emphasis added), the Supreme Court has elsewhere treated "relating to" and "respecting" as synonyms. *See Lamar, Archer & Cofrin, LLP*, 138 S. Ct. at 1760 (noting that "relating to" "is one of the meanings of 'respecting'").

### ii. S.B. 248 Undermines the Purposes of the FCRA and Is thus Impliedly Preempted.

The FCRA also impliedly preempts S.B. 248. Federal law impliedly preempts state law when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quotations and subsequent history omitted). To determine Congress's purpose in enacting a statute, courts "examin[e] the federal statute as a whole and identif[y] its purpose and intended effects." *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1179–80 (9th Cir. 2016) (quotation marks and citation omitted). Determining whether state law frustrates the purposes of Congress is "a matter of judgment," decided by reference to whether the act would be "refused [its] natural effect." *Crosby*, 530 U.S. at 373 (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

Congress was clear about its purposes in passing the FCRA. The law itself states that "[t]he banking system is dependent upon fair and accurate credit reporting" and that "[i]naccurate credit reports directly impair the efficiency of the banking system." 15 U.S.C. § 1681(a)(1). Because the banking system depends on "accurate" credit reporting and because consumers depend on fair systems of credit reporting, Congress set up an "elaborate mechanism … for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Id.* § 1681(a)(1)–(2). As the Supreme Court has observed, "Congress enacted [the] FCRA in 1970 to ensure fair and *accurate* credit reporting." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (emphasis added).

S.B. 248 undermines accuracy in credit reporting, placing itself in the way of the "accomplishment and execution of the full purposes and objectives of Congress." *In re Volkswagen*, 959 F.3d at 1212 (quotations omitted). As the State acknowledges, S.B. 248 prevents debt collectors from reporting medical debts until they have given the Section 7 Notice and waited sixty days.[7]  S.B. 248 thus creates a sixty-day delay in which creditors hoping to learn about a Nevada debtor's creditworthiness operate in limbo. The "natural effect" of such a delay is to decrease the accuracy of credit information.  *Crosby*, 530 U.S. at 373.

The relationship between delay and inaccuracy should be self-evident, but a simple hypothetical easily illustrates it.  If a state law required a one-year delay before reporting defaults on a debt, no one would deny that the accuracy of credit reporting would suffer from that delay.  A sixty-day delay contributes to the same *type*, if not magnitude, of inaccuracy.  *See Lands Council v. Powell*, 395 F.3d 1019, 1036 (9th Cir. 2005) (recognizing that outdated data, inter alia, rendered a database "inaccurate"); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (explaining that a goal of Congress in enacting the FCRA was "establish[ing] credit reporting practices that utilize … *current* information" (emphasis added)).

The majority hypothesizes that such delay is a desirable feature, not a bug, of an accurate credit reporting system. According to the majority, requiring sixty days for medical debtors to verify the debt "may … improve the accuracy of

---

[7] And the concession makes sense, as the State can offer little argument for the conclusion that a debt collector reporting a debt to a CRA is taking that action for any purpose other than "to collect a … debt."  S.B. 248 § 7(1).

the information that debt collectors furnish to CRAs." But the majority's reasoning consists of one conclusory sentence and no factual or legal support. The FCRA already offers robust mechanisms for consumers to correct inaccurate debt information. *See* 15 U.S.C. § 1681s-2(a)–(b). Those mechanisms ensure that debtors can correct inaccurate information in credit reports, obtaining a similar benefit as the majority speculates might be obtained by S.B. 248's delay, but without the burden of a delay in debt-reporting. And neither the majority nor the State cite any evidence (or advance any argument) suggesting that debt collectors who comply with the FCRA's regulations inaccurately report debts with any substantial frequency. The majority's suggestion that S.B. 248 may increase accuracy is thus based on pure conjecture.

In short, S.B. 248's mandatory sixty-day delay in credit reporting stands as an obstacle to the accomplishment of Congress's "accuracy" goals in the FCRA. The FCRA lacks a waiting period comparable to the one Nevada seeks to impose in S.B. 248. We can infer from that omission, together with the considered judgment Congress made in passing the FCRA, that a waiting period causing financial institutions to suffer delayed (and thus inaccurate) assessments of Nevada residents' medical debt "would be inconsistent with federal policy and objectives." *Arizona v. United States*, 567 U.S. 387, 405 (2012); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal."). S.B. 248 is thus preempted under the Supremacy Clause.

## II.     The District Court Erred in Its Analysis of the Remaining Factors for a Preliminary Injunction.

To be entitled to a preliminary injunction, Aargon Agency must also show that, absent a preliminary injunction, it is likely to suffer irreparable harm and that both the balance of equities and the public interest weigh in favor of a preliminary injunction.  *See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  Aargon Agency will suffer irreparable harm when it must choose between complying with an unconstitutional (here, preempted) law that causes it financial harm or refusing to comply and being punished for doing so.  *See Morales*, 504 U.S. at 381; *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–59 (9th Cir. 2009).  And the balance of equities and the public interest weigh in favor of enjoining S.B. 248, a law that both makes compliance with the FDCPA impossible and undermines Congress's purposes in enacting the FCRA by decreasing the accuracy of credit reporting.  *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1059–60.  Accordingly, I would have concluded that these factors weigh in favor of a preliminary injunction.

## CONCLUSION

Because the majority errs in concluding that Aargon Agency is unlikely to succeed on the merits of its preemption claims and thus affirms the district court's denial of a preliminary injunction, I respectfully dissent.